# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**No.** _20-mj-03523-Louis_

## IN RE: SEALED COMPLAINT

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?         ___Yes  _X_ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  ___Yes  _X_ No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?  ___Yes  _X_ No

Respectfully Submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: _____
DAVID A. SNIDER
Assistant United States Attorney
Court ID No. A5502260
99 NE 4TH Street
Miami, FL 33132
Fax: (305) 530-6168
Tel. (305) 961-9159
Email: david.snider@usdoj.gov

ROBERT ZINK
CHIEF, FRAUD SECTION

By: _____
PHILIP B. TROUT
Trial Attorney, Fraud Section
U.S. Department of Justice
1400 New York Ave NW
Washington, DC 20530
Fax: (202) 514-0152
Tel: (202) 616-6989
Email: philip.trout@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint                     original

# UNITED STATES DISTRICT COURT

### for the

Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Tiara Walker | ) | Case No.   20-mj-03523-Louis |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __May 14, 2020 to July 24, 2020__ in the county of _____Miami-Dade_____ in the

___Southern___ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire and Bank Fraud |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

_____Michael Benivenga, Speical Agent, IRS-CI_____
_Printed name and title_

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by  WhatsApp.

Date:   ___September 3 2020___                    _____
_Judge's signature_

City and state:   _____Miami, Florida_____          Hon. Lauren F. Louis, U.S. Magistrate Judge
_Printed name and title_

## AFFIDAVIT

I, Michael Benivegna, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of a criminal complaint charging TIARA WALKER ("WALKER"), with wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344, and 1349, from on or about May 14, 2020, to at least on or about July 24, 2020, in the Southern District of Florida, and elsewhere (the "Target Offenses").

2.      WALKER and conspirators have participated in a scheme to obtain by fraud millions of dollars in forgivable loans through the Paycheck Protection Program ("PPP") and other government programs, and have done so by conspiring with a person now cooperating with the investigation ("CHS 2") and others.  WALKER obtained a fraudulent PPP loan for her own company, Utilization Review Pros LLC ("URP"), a Florida limited liability company, with CHS 2 providing falsified documents and submitting the application on WALKER's behalf in exchange for a kickback from the loan proceeds.   To inflate the size of these PPP loans, and the corresponding kickbacks, the conspirators relied on a variety of false statements, including by submitting falsified bank statements and payroll tax forms.  For example, the conspirators used nearly identical versions of the same fabricated bank statements, recycled in the PPP applications for multiple companies with minor changes.

3.      The conspirators in the scheme planned or prepared at least 90 fraudulent applications, most of which were submitted.  Based on the evidence investigators have reviewed to date, CHS 2, WALKER, and their co-conspirators applied for PPP loans that are together worth more than $24 million dollars, with at least approximately 42 of those loans approved and funded

for a total of approximately $17.4 million.  Certain of those loan recipients then wired a kickback of varying amounts, often approximately 25% of the fraudulent loan proceeds, to an account controlled by CHS 2.

     4.     I am a Special Agent with the United States Department of The Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been employed in this capacity since October 2016.  I am presently assigned to the Miami Field Office.  My duties as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Code (Title 26 of the United States Code), the Bank Secrecy Act (Title 31 of the United States Code), and the Money Laundering Statutes (Title 18 of the United States Code).  I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in April 2017 and the Special Agent Investigative Techniques program at the National Criminal Investigation Training Academy in July 2017.  In these two programs, I studied a variety of law enforcement tactics and criminal investigator techniques relating to tax and financial crimes.  Since becoming an IRS-CI Special Agent, I have personally investigated and assisted in investigations relating to the Internal Revenue Laws and financial crimes.  Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners, including the Federal Bureau of Investigation and the Small Business Administration Office of Inspector General, to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 program.

     5.     The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and from witnesses.  This Affidavit is intended to show merely that there is sufficient probable cause and does not set

forth all of my knowledge about this matter.[1]

## PROBABLE CAUSE

### *The Paycheck Protection Program*

6.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP.  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

7.      In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business.   The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

8.      A PPP loan application must be processed by a participating lender.  If a PPP loan

---

[1]      The conduct and charges described in this Affidavit are part of a larger investigation that is being conducted in this District and elsewhere.  As a result, not all numbered sources and anonymous individuals and entities are described in every filing. I have included in this Affidavit only those individuals and entities I have deemed necessary to explain the particular facts set forth here.

application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

9.      PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

### *The Scheme to Obtain Fraudulent PPP Loans*

10.      On or about May 13, 2020, Phillip J. Augustin ("Augustin") and CHS 2 worked together to submit a fraudulent PPP loan application on behalf of a company owned by Augustin. Augustin submitted a PPP loan of $84,515 to a federally insured bank (hereinafter "Bank 3"), through a third-party company processor (hereinafter "Bank Processor 1").[2] The application included bank statements that are clear forgeries, and CHS 2 has admitted that the application was based on documents that he falsified for Augustin.[3]

11.      Following the success of that initial fraudulent PPP application, Augustin and CHS

---

[2]      All banks referenced in this Affidavit are insured by the Federal Deposit Insurance Corporation.

[3]      On June 25, 2020, investigators arrested CHS 2 and another person now cooperating with the investigation ("CHS 3") and executed search warrants at their residences. Following his arrest, CHS 2 chose to cooperate with the investigation in the hope of obtaining favorable consideration in connection with his pending charges. CHS 2 was interviewed on that day, and has continued to cooperate with the investigation after obtaining counsel. Most of his statements related herein have been corroborated by records obtained from third parties or recovered from his electronic devices.

2 began to work on obtaining more and larger PPP loans for Augustin's associates and others, generally for several hundred thousand dollars for each loan, up to as much as approximately $1.24 million. Based on the evidence investigators have reviewed so far, CHS 2 and Augustin collectively coordinated applications for PPP loans that are together worth more than $24 million dollars. The evidence also shows many more PPP loans were attempted but rejected by banks or their partners, or were planned and prepared, but not submitted before CHS 2's arrest. The evidence suggests that all or nearly all of those loan applications were fraudulent, including WALKER's loan application.

12.     Investigators have obtained many other PPP loan applications that CHS 2 has admitted he submitted as part of this scheme, based on falsified documents, and have also obtained draft documents used or intended to be used in those applications or others. These applications all follow the same pattern of fraud—many with obviously counterfeit February 2020 bank statements, and all with fabricated IRS Forms 941 (titled, "Employer's Quarterly Federal Tax Return") with the same indicia of fraud found in Augustin's initial application—but generally with even larger inflated payroll numbers, thus yielding much larger loans.[4] CHS 2 has explained to investigators that the figures in the Forms 941 were the product of a formula that allowed him to start with a target loan amount, and then "back into" the payroll figures on the form. He explained how he used figures that would produce an average monthly payroll for 2019 that, when multiplied by 2.5, would yield the requested loan amount. In turn, the number of employees reported was chosen based on fictional payroll figures, chosen to avoid an average employee salary that might

---

[4]     Some loan applications also included voided checks that appear to be falsified, such as a purported Bank 5 check that appears to have been produced on a computer and, as the subject line reads, "Converted to PDF," rather than a scan of an authentic check.

raise suspicion.

13.     CHS 2 has also explained that he tried to use bank statements showing that the company had a large balance.  Because so few companies had such a statement, and likely also because it was easier than keeping track of their true statements, CHS 2 repeatedly submitted near-replicas of the same falsified bank statements.  In particular, CHS 2 appears to have recycled one statement each from Bank 1, Bank 6, and Bank 7.  In recycling a statement, CHS 2 generally changed only the account number and the account holder's name and address, such that each version of the statement had identical figures and line items throughout the statement.

14.     A review of records for bank accounts controlled by CHS 2 at Bank 5 confirm CHS 2's admissions that he received numerous kickbacks, often of approximately 25% of the amount of the loans, and that he regularly wired Augustin a share of that kickback in the early stages of the scheme.  CHS 2 explained that they were doing so many loans by the end of May that he changed course, instead wiring larger lump sums, collecting Augustin's shares of the kickbacks for multiple loans in one wire.

15.     Investigators are still receiving and analyzing records, but based on a preliminary analysis, as of August 31, 2020, investigators had identified a total of $2,367,765.82 in transfers to CHS 2's accounts from entities that each obtained a sizable PPP loan and that were identified in the PPP files seized from CHS 2's and another co-conspirator's residences, as described below—or from individuals associated with those entities.

16.     The PPP loans identified above as implicated in the foregoing kickback payments to CHS 2 represent only a fraction of the overall scheme.  In executing search warrants at the respective residences of CHS 2 and CHS 3, federal agents found stacks of paper printed out and organized by entity, containing an "intake form," fabricated Forms 941, or both for each entity.

The intake forms contained fields for the information needed to fabricate the documents and fill out other aspects of the PPP application: identifying information about the owner and company, as well as bank account information for receiving the loan.  A section at the end marked "BELOW IS OFFICE USE ONLY" included blank fields for the "Number of Employees," "Monthly Payroll Expense," and "SBA Loan Pre-Approval Amount."  Between CHS 2's and CHS 3's residences, investigators seized paper files for PPP loan applications for approximately 80 different entities.

### *The Fraudulent PPP Loan to WALKER's Company: URP*

17.     According to Florida's Division of Corporations website ("Sunbiz"), URP was established as a Florida limited liability company on August 28, 2019.  WALKER is listed as the company's Chief Executive Officer and registered agent.  According to Sunbiz, the principal address of URP is the same address that appears on WALKER's Florida Driver and Vehicle Database (DAVID) record.

18.     On or about May 17, 2020, a PPP loan application package on behalf of URP was electronically submitted to Bank 2 through Bank Processor 1.  IP session records from Bank Processor 1 for the loan application show that a computer with an IP address (ending in 170) associated with CHS 2's residence in Broward County, Florida, logged into the URP loan account as early as May 16, 2020.  The session records also reveal another login by the same IP address (ending in 170) on the same day, as well as subsequent logins on May 18 and May 19, 2020 by a computer with an IP address (ending in 214) associated with the Miami-Dade County residence of WALKER.

19.     The loan application package included, among other documents: (1) four purported Forms 941 for each quarter of 2019 in the name of URP; (2) a purported company bank statement for URP from Bank 7; and (3) a Borrower Application Form for a PPP loan request of $258,575

for URP based upon a purported average monthly payroll of $103,430 for 12 employees (the "PPP Application Form").

20.     The purported Forms 941 submitted with URP's PPP loan application package show quarterly payroll of over $300,000 each quarter, for 12 employees. That quarterly payroll figure yielded the PPP loan application's "Average Monthly Payroll" figure of $103,430.00, which determined the $258,575.00 amount of the loan. Each Form 941 was signed by hand with the name "Tiara Walker" as the company owner, and also listed "Tiara Walker" as the company's designee and as a "Paid Preparer," although WALKER is not a paid tax preparer.

21.     The purported Forms 941 submitted with URP's PPP loan application package follow the same style and pattern, including the indicia of fraud, as the many other Forms 941 that CHS 2 acknowledged that he helped create and submit in the course of the scheme, as described above.[5] Moreover, IRS records show that URP did not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020, and Florida Department of Revenue records show that URP did not report any wages or employees for that same period. As noted above, according to URP's articles of organization available on Sunbiz, URP was not even established as a Florida limited

---

[5]     As noted above, WALKER was listed as both owner and paid preparer. Dozens of other Forms 941 submitted in this scheme evidence the same error. CHS 2 has admitted that these documents share that feature because he misunderstood the form, and he (or someone following his instructions) prepared the Forms 941 at issue. The content of the forms also indicate falsification. URP submitted two pairs of identical 941s (Q1 and Q2 are identical, and Q3 and Q4 are identical, down to the penny in reported figures). They also evidence a pattern of payroll spending that is likely false: each of the quarters shows significant increases from the first to second to third month of the quarter. For each identical form, the same figures are reported for the tax liability incurred in the first month of each quarter, the same figure for the second month of each quarter (increased substantially from the first month), and the same figure for the third month of the quarter (increased substantially from the second month). The result is that the company reports a perfectly repeating cycle of ascending payroll costs within each quarter. CHS 2 has explained that this was due to a formula he used, allocating different percentages of the quarterly payroll tax liability to each month of each quarter.

liability company until August 28, 2019.

22.     The purported company bank statement for URP submitted with its PPP loan application package, which was submitted in electronic format as a PDF, is a clear forgery. First, it purports to be a February 2020 bank statement from Bank 7; however, based upon bank records I have reviewed to date from Bank 7, URP did not have an account at Bank 7 in February 2020. Second, according to the PDF file "properties," the February 2020 statement was created using "PDFFILLER," a program used to edit electronic PDF files, and was "modified using iText." The metadata shows the file was created on May 14, 2020 and modified on May 16, 2020. Third, the statement is a recycled version of the same falsified Bank 7 statement used in other fraudulent applications submitted as part of this scheme.

23.     The PPP Application Form submitted with URP's loan application package reflects that URP has 12 employees with an average monthly payroll of $103,430, which resulted in its loan request of $258,575. The PPP Application Form required the borrower to electronically initial and/or sign (via DocuSign, as explained below) a number of "certifications," including: (1) that the applicant was in operation on February 15, 2020 and had employees to whom it paid salaries/payroll taxes or paid independent contractors, as reported on Form(s) 1099; (2) that the funds would be used to retain workers, maintain payroll, or make mortgage/interest/lease/utility payments as specified by the PPP rule and that unauthorized use could result in charges for fraud; and (3) that the information provided in the application, including in supporting documents, was "true and accurate in all material respects," and that making false statements could result in criminal charges.

24.     Based on the false and fraudulent representations made in the PPP Application Form and supporting documents, Bank Processor 1 approved the PPP loan application for URP.

As explained in greater detail below, Bank 2 wired $258,575 in loan proceeds to URP on May 19, 2020.

**_Records Show that WALKER Viewed and Signed the PPP Application Form_**

25.     In connection with this investigation, law enforcement obtained records from DocuSign pursuant to 18 U.S.C. § 2703(d). The DocuSign records shows that, on May 17, 2020, at 8:32 a.m., Bank Processor 1 sent the PPP Application Form to the DocuSign user "Tiara Walker" at the email address "utilizationreviewpros@gmail.com." Records obtained from Google show that "Tiara Walker" is the account holder for the email address "utilizationreviewpros@gmail.com" and that the phone number associated with that email account is, according to AT&T records, an AT&T wireless cell phone number ending in 9993 that is assigned to the user "Tiara Walker." The phone number for URP listed on the PPP Application Form is the 9993 cell phone number. As discussed below, WALKER used both the email address "utilizationreviewpros@gmail.com" and the 9993 cell phone number to communicate with CHS 2 in connection with the fraudulent PPP loan for URP.

26.     Based upon these records from DocuSign, Google, and AT&T, WALKER viewed the PPP Application Form on May 17, 2020 at 8:33 a.m., and WALKER signed the PPP Application Form on May 17, 2020 at 8:38 a.m.

**_Emails and Text Messages Provided by CHS 2 Confirm WALKER's Knowing Participation in the Fraud_**

27.     As part of its investigation, law enforcement obtained communications between CHS 2 and WALKER, including text messages and emails provided by CHS 2 to law enforcement. Based upon my review of these emails and text messages, and CHS 2's statements to law enforcement regarding the same, CHS 2 provided WALKER with the pre-filled IRS Form 941, which CHS 2

included in URP's PPP loan application after WALKER signed and returned the forms.

28.     Specifically, on May 16, 2020, CHS 2 sent an email to WALKER (at the email address "utilizationreviewpros@gmail.com") that attached four PDFs of unsigned IRS Forms 941—one for each quarter of 2019. Each unsigned Form 941 attached to that email was pre-filled by CHS 2 to represent that URP had, for each respective quarter of 2019, 12 employees and over $300,000 in quarterly payroll.

29.     At or near the time of emailing these unsigned IRS Forms 941 to WALKER, CHS 2 sent a text message to WALKER (at the 9993 cell phone number) instructing WALKER to backdate each Form 941 with the following specific dates as to each Form 941: April 4, 2019; July 3, 2019; October 5, 2019; and January 6, 2020. Then, in another text message, CHS 2 told WALKER, "Text me once you send those docs."

30.     Approximately 42 minutes after CHS 2 emailed WALKER the four unsigned IRS Forms 941, WALKER replied to CHS 2's email and attached copies of the four IRS Forms 941 that were now each signed and dated. The signature on each Form 941 that WALKER sent to CHS 2 is similar to the signature on WALKER's DAVID record, and each Form 941 was dated with the respective date that CHS 2 had texted to WALKER as to each quarter (April 4, 2019; July 3, 2019; October 5, 2019; and January 6, 2020).

31.     At or near the time of emailing these signed and dated IRS Forms 941 to CHS 2, WALKER sent CHS 2 text messages that stated, "I sent them" and "Let me know if I need to resend it." CHS 2 responded, "Looks good," and WALKER replied "Awesome, thank you for your help."

32.     The signed Forms 941 that WALKER sent CHS 2 are identical to the signed Forms 941 submitted with the PPP loan application for URP. As noted above, IRS records show that

URP did not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020, and Florida Department of Revenue records show that URP did not report any wages or employees for that same period.

***Bank Records and Text Messages Confirm WALKER's Receipt of the PPP Loan and Further Demonstrate WALKER's Knowing Participation in the Fraud***

33.     Bank records show that URP had an account at Bank 11 ending in *1675 ("Bank 11 *1675"). A signature card for the Bank 11 *1675 account shows that WALKER opened the account on September 11, 2019 as "manager" of URP, and that WALKER is the only signer for the Bank 11 *1675 account. On May 19, 2020, the Bank 11 *1675 account received via bank wire $258,575 in loan proceeds from Bank 2 as a result of URP's fraudulent PPP loan application.

34.     On the same day that URP received the proceeds of the fraudulent PPP loan, WALKER opened a new account at Bank 11 Bank ending in *5066 ("Bank 11 *5066") as the "owner" of URP. WALKER is the only signer on the Bank 11 *5066 account. On May 20, 2020, WALKER transferred $258,575 from the Bank 11 *1675 account to the Bank 11 *5066 account. In a text message from WALKER to CHS 2 sent on May 20, 2020, WALKER told CHS 2 that "the funds are now available."

35.     Also on May 20, 2020, WALKER wired $64,645, which equaled approximately 25 percent of the proceeds of URP's PPP loan, from the Bank 11 *5066 account to an account controlled by CHS 2 at Bank 5. Text messages between CHS 2 and WALKER from May 19, 2020 show that CHS 2 sent WALKER wire instructions for his account at Bank 5 to which WALKER wired the $64,645 kickback payment. On May 20, 2020, WALKER sent a text message to CHS 2 stating that she had sent the wire to CHS 2. CHS 2 responded "Thank you," and WALKER replied "No thank you."

36.     Based on my review of the bank records discussed above, WALKER has spent a

significant amount of the remaining PPP loan proceeds. Between May 20, 2020 and July 24, 2020, WALKER withdrew approximately $149,000 in checks drawn from the Bank 11 *5066 account, including many checks written to herself and to cash. Moreover, it does not appear that any of the proceeds of the PPP loan were used for legitimate business expenses or payroll related expenditures to any employee other than WALKER herself.

## CONCLUSION

37.     Based on the forgoing, I respectfully submit that there is probable cause to believe that TIARA WALKER committed the Target Offenses.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

MICHAEL BENIVEGNA
Special Agent
IRS-CI

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by WhatsApp on this  3    day of September, 2020

HON. LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE