**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-60159-CR-RAR**

**UNITED STATES OF AMERICA,**
       **Plaintiff,**
**v.**


**TIARA WALKER,**
       **Defendant.**

_____/

**TIARA WALKER'S REQUEST
FOR VARIANCE AND SENTENCING MEMORANDUM**

COMES NOW, *Tiara Walker*, by and through undersigned counsel, Peter T.

Patanzo, Esq., and the Law Offices of Benjamin, Aaronson, Edinger & Patanzo, PA,

pursuant to 18 U.S.C. § 3553(a), 18 U.S.C. § 3661 and Rule 32(i)of the Federal Rules

of Criminal Procedure, respectfully files this Sentencing Memorandum and request

for a downward variance from the advisory guideline range, and in support states

the following:

**INTRODUCTION**

As an initial matter, Ms. Walker has pled guilty and acknowledges her guilt

in the instant offense.  She accepts full responsibility for her conduct, understands

the offense is serious and requires the appropriate attention from this Court. Ms.

Walker stands before the Court in more trouble than she has ever imagined

possible. She is 37 years old and facing a term of imprisonment understanding she

has two children to educate and support. She has embarrassed herself in the eyes of

her children and humiliated her family through her illegal conduct. Having said

1

that, in the time this case has been pending, Ms. Walker has achieved the many

purposes of sentencing and experienced substantial rehabilitation.

Ms. Walker is remorseful and contrite. She has attempted to repay society

already by waiving many substantial rights, admitting her conduct, and pleading

guilty with the benefit of a written plea agreement. Ms. Walker has agreed to

cooperate with the Government and has agreed to many financial obligations

because of her conduct. These actions have assisted in the appropriate allocation of

resources of the Government and the Judiciary and helped to facilitate the

administration of justice. Ms. Walker intends to further repay society through the

successful completion of any sentence imposed by this Court, thereby achieving

total rehabilitation.

We believe, after careful consideration of the sentencing factors under 18

U.S.C. § 3553(a), including, the seriousness of the offense, deterrence, retribution

and rehabilitation, the Court will find a downward variance is appropriate. More

importantly, no matter what sentence is imposed, the Court will take comfort in

knowing that Ms. Walker will never again be before this Court or any other,

because of further criminal conduct.

### BRIEF FACTUAL AND PROCEDURAL HISTORY

On September 9, 2020, Ms. Walker made her initial appearance in United

States District Court on a criminal complaint charging her with wire fraud, bank

fraud and conspiracy. The essence of the case is that Ms. Walker and her co-

conspirators, James Stote and Damion McKenzie, conspired to obtain a fraudulent

loan from the paycheck protection loan program, part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES ACT").

On March 26, 2021, pursuant to a written plea agreement, Ms. Walker pled guilty to a one count information charging her with conspiracy to commit wire fraud, pursuant to 18 U.S.C. § 371. In her plea to the Court, the Defendant accepted responsibility for her conduct that resulted in the funding of a $258 thousand dollar loan based on false information related to her company Utilization Review Pros.

On April 28, 2021, the initial draft of the presentence report was disclosed. The presentence report concludes that the Total Offense Level is 15, after a 3-level downward adjustment for her acceptance responsibility. Ms. Walker has no prior criminal history and is a criminal history category I. As a result, the advisory guideline range is 18 to 24 months. The Defendant has agreed to pay restitution and the Court has entered a preliminary order for a forfeiture money judgement. Probation has concluded that Ms. Walker has a negative net worth and unable to pay to fine in addition to the mandatory restitution. Sentencing is scheduled for July 13, 2021, at 10am before this Honorable Court.

## MOTION FOR DOWNWARD VARIANCE

The overriding principle and basic mandate of Section § 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing, retribution, deterrence, incapacitation, and rehabilitation. The District Court's task is to impose a sentence that will adequately reflect the seriousness of the offense, promote respect for the law,

provide just punishment, protect the public from further crimes of the Defendant, and provide the Defendant with any needed training and treatment in the most effective manner. *18 U.S.C. § 3553(a)(2).*

The task is a holistic endeavor that requires the District Court to consider a variety of factors including: (1) the nature and circumstances of the offense, (2) the Defendant's history and characteristics, (3) the kinds of sentences available, (4) the applicable sentencing guidelines range, (5) pertinent policy statements of the Sentencing Commission, (5) the need to provide restitution to any victims, and (6) the need to avoid unwarranted sentencing disparities. *Id. § 3553(a).* The District Court must consider all the factors, but it may, in its discretion, give greater weight to some factors over others. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015).

The discretion the Court enjoys is substantial and the Court may (and should) consider individualized and particularized facts for the individual, and not merely the guidelines label that can be put to those facts," *Id.* at 1260. While the seriousness of offense cannot be understated, Ms. Walker's history and characteristics are significant, and her rehabilitation is substantial.
After considering the totality of the circumstances, a sentence for Ms. Walker below the advisory range is "sufficient but not greater than necessary" to achieve the purposes of sentencing.

A.      **Ms. Walker's History and Characteristics**.

Ms. Walker's history and characteristics are significant. Tiara Walker is 37 years old and has no criminal history. She was born to the marital union of Derek and Joyce Walker. Her father is retired from the United States Army and now employed as a general manager of a convenience store for the Seminal Tribe. In 2014, Mr. Walker was diagnosed with multiple myeloma. Her mother is a housewife and full-time caregiver for her disabled daughter, Crystal who is 34 years of age. The couple has one other child together, Takierra Walker, age 23, who is employed in management for STEPS retail clothing store.

Ms. Walker was born in Miami, however, due to her father's career in the Army the family lived throughout the United States and in Germany. Notably, in 1989, while traveling on the Autobahn in Germany, the family's car was struck by a truck. Ms. Walker suffered minor injuries. Her sister Crystal suffered brain trauma and became disabled. Crystal is non-verbal and cannot perform daily self-care, making her totally reliant upon her family for her care.

Ms. Walker was raised in a lower middle-class home whose family made best efforts to provide support. Her father remained in the service away from home until 2001. She and her family returned to the Miami area in 1997. The family struggled financially and lived with other family members until her father retired and returned home to provide additional support.

In 2003, Ms. Walker became romantically involved with Damion McKenzie. Presently Mr. McKenzie is charged with a variety of crimes in a related case and as

a co-conspirator in the instant offense. Mr. McKenzie is a manager of a nightclub in Miami Beach. Ms. Walker and Mr. McKenzie have two children, Daijah age 17, and Divine age 15. Divine suffers from Type II diabetes and has learning disabilities. Additionally, in February 2021, Divine was diagnosed with depression and is receiving mental health care.

Since 2017, Ms. Walker has resided with her parents and children in a three-bedroom, two-bathroom home located in Miami Gardens. Notably, the Defendant was living with her parents during the offense conduct. The Defendant is presently under the care of Primary Care Physicians, located in Pembroke Pines. In 2001, she was diagnosed with Type II diabetes and is currently taking multiple daily insulin injections. She suffers from high blood pressure, nerve pain, high cholesterol, and osteoarthritis. Ms. Walker is prescribed a variety of medication for her medical conditions.

The Defendant is also presently receiving treatment for knee injuries and uses a cane to walk. Ms. Walker is being seen by Spien Orthopedic & Orthopedic Center in Plantation. In 2013, Ms. Walker injured her right knee in an accident that required surgery to the right meniscus. In 2019, she injured her left knee in an accident that required surgery to the left meniscus. Presently, she is having issues with her right meniscus and her doctors have recommended an osteotomy to cut and reshape the bone to make it stable. Ms. Walker attempted to have this surgery prior to sentencing, however, do to other medical issues, this surgery has been delayed but still necessary.

In 2013, Ms. Walker received her general education development certificate from the Florida Department of Education. She continued her education at Florida Career College and received her certification as a medical billing and coding specialist in 2005.

Ms. Walker has always been gainfully employed. She began her career working full-time in the medical billing industry. In and around 2015, Ms. Walker was employed in the hospitality and entertainment industry, planning parties, catering and baking desserts. When business slowed in 2019, Ms. Walker was hired by the utilization department of Panacea Healthcare Solutions, a medical billing company in Sunrise. In August 2019, she was given the opportunity to work from home, however, she was required to register as an independent contractor and that is when Utilization Review Pro's was formed. Ms. Walker continued as a subcontractor until July 2020. She continues to work independently and contracts with various businesses to provide billing services. Since her arrest, work has slowed considerably, and work has been scarce.

B. **The Need for the Sentence Imposed**.

Understanding that the offense is serious, just punishment can be achieved through a sentence below the advisory guideline range. A review of the factors set forth in section §3553(a), will show that Ms. Walker has already achieved many of the purposes specifically set forth in sentencing. The Defendant's characteristics, the overwhelming good she has done in her life and the unlikelihood of her to re-offend, support a sentence below the advisory guideline range.

While retribution is a critical factor to consider and seen as "the punishment should fit the crime", it must still be tempered by the individual characteristics of the person and the rehabilitation already achieved. The need for retribution is measured by the nature and seriousness of the harm caused by the crime, along with the offender's degree of culpability, in particular, her degree of intent, motive, and likelihood to re-offend. *Richard S. Frase, Excessive Prison Sentence, Punishment Goals, and the Eight Amendment: "Proportionality" Relative to What?, 89 Minn. L. Rev. 571, 590 (February 2005)*. A Defendant's motive is highly relevant at the time of sentencing. *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11(E.D.Wis.2005) (granting a variance where the defendant did not take money out of greed or a desire to live a lavish lifestyle).

Ms. Walker's recognition that the offense is serious cannot be understated. Ms. Walker has accepted responsibility for her actions and understands that her poor judgement and bad decisions got her in this situation. Like many, Tiara found herself in a situation in which she was overwhelmed in responsibilities both financial and family and could not keep up with the demands. She lost sight of her foundation and good nature and exercised poor judgement. Her motivation was not out of greed, to live a lavish lifestyle or provide for social opportunities at the expense of the taxpayers. In fact, Ms. Walker was residing with her children in her family's home at the time of the offense. She did not purchase extravagant items out of greed like others charged in similar offenses. Much of the money was given to Mr.

McKenzie in cash transactions or spent on everyday expenses to keep up. Certainly not an excuse for the poor decisions, however, the added stress and anxiety contributed to the decision to engage in the conduct in the instant offense. More importantly, Ms. Walker is unlikely to reoffend.

Ms. Walker has respect for the law. She fully recognizes the seriousness of the offense and appreciates the consequences of her actions which in turn promotes respect for the law.  She has otherwise lived her entire life in the manner of a law-abiding citizen and could never have imagined she would now be facing a term of imprisonment. She comes from a military family that promotes respect for the law and does not engage in this type of criminal behavior. The mandate of sentencing is not to only punish, but rather, to punish justly. The overriding principle of sentencing requires that a person not be only judged on their worst day, but rather, judged on their entire history and background when fashioning a sufficient sentence.

Ms. Walker understands that the Court must also consider deterrence when imposing a sufficient but not greater than necessary sentence. Moreover, she recognizes that deterrence, under section § 3553(a)(2)(B), speaks to general deterrence of the public, not recidivism of this offender. The purpose and legislative history behind this type of deterrence is that Congress viewed this factor as particularly important in the area of white-collar crime. S.Rep. N. 98-225, at 76 (1983). Congress believed that economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are

prime candidates for general deterrence. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006), *see also, Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005).

Respectfully, the totality of the circumstances suggest that this is not the offender to set the example of by imposing a harsh sentence for the purpose of sending the message to the general public that this type of crime will not be tolerated. Ms. Walker's conduct was not one of planning and calculation, or cool rational thought and her role in the offense weigh in favor of mitigation. Her conduct is more in line with doing what she was told by others more sophisticated in the offense. Ms. Walker's level of participation is less than Mr. Stote and Mr. McKenzie. She did not plan the offense or initiate the criminal conduct. Her lack of knowledge of the intricacies of the crime supports her level of participation in the offense. The email exchanges with Mr. Stote supports this suggestion.

When the Court balances the seriousness of the offense with the Defendant's history, characteristics, and role in the offense, just punishment can be achieved by a sentence below the advisory range. In other words, the totality of the circumstances weigh in favor of not making an example of this Defendant and consideration of a sentence below the advisory range.

Lastly, the Court need not be concerned about Ms. Walker reoffending and protecting the public from further criminal conduct from this defendant. This experience has had a profound impact on her and her family. She recognizes the consequences of her actions will separate her from her children and those closest to

her at a time when she is needed the most. More importantly, Ms. Walker recognizes the impact of her decisions on the rest of her life including all collateral consequences such as her status as a convicted felon and the impact it will have on her ability to provide for her family. The Court can take great comfort in knowing that Ms. Walker will never again be before this Court for committing further criminal conduct.

1.    **Ms. Walker's Conduct was Aberrant and she has an
      <u>Exceptionally Low Risk of Recidivism.</u>**

There is no doubt that the Defendant's conduct in the instant offense constitutes a single occurrence and represents a marked deviation from Ms. Walker's otherwise law-abiding life. Ms. Walker stands before the Court a 37-year-old single mother of two with strong family ties and solid support system to aid in rehabilitation. Moreover, the totality of the circumstances show she was not a leader organizer of the offense and her participation, while regrettable, can be viewed as minor and limited for the offense.

Statistically, those offenders with zero criminal history points or with a criminal history category I, are those considered the least likely to re-offend. Ms. Walker has taken the substantial steps in this matter in accepting responsibility and beginning the rehabilitation process since her arrest. Moreover, there is no evidence of any substance abuse or abuse of alcohol.

Courts have considered strong family ties important to sentencing decisions. In the Commissions 2010 survey of district judges, more than 60% have said that family ties and responsibilities are relevant to consideration of a departure or

variance. The Defendant has otherwise been a model citizen throughout her life but now more than ever has the motivation to be a good role model for her family. More importantly, the Defendant has strong family ties to aid in rehabilitation. It is reasonable to conclude that, the totality of the circumstance proves Ms. Walker's likelihood to reoffend is remarkably low.

When fashioning any sentence this Court should consider the statistically low risk of recidivism presented by Ms. Walker's history and characteristics. *United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding a downward variance on the basis of the defendant's first offender status); *United States v. Hamilton*, 323 Fed.Appx. 27, 31 (2d Cir. 2009) (the district court abused its discretion by not considering policy consideration with regard to age recidivism not included in the guidelines); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history and strong family ties).  In this case, the court can take comfort in knowing that Ms. Walker will never again be before this Court or any other because of future criminal conduct.

Just punishment and a sufficient, but not greater than necessary sentence requires a discussion about the collateral consequences of this case. One could argue that these consequences will have as much of an impact on Ms. Walker as a prison sentence imposed by this Court.

2.    **The Stigma of Being a Convicted Felon.**

Ms. Walker recognizes that, by accepting responsibility for her conduct she would be classified as a convicted felon. Moreover, she recognizes her convicted felon status would be seen through the lens of a fraud conviction and theft of government relief funds. It is undeniable that, the consequences of her actions will continue well beyond the service of this Court's sentence and will result in irreparable damage to her reputation and economic opportunities in the future. One could argue, these collateral consequences will be more difficult and long lasting than a prison sentence. Ms. Walker will suffer the loss or restriction of many privileges and rights. The conviction will make her ineligible for many things such as housing, loans to further her education, and the inability to gain employment in the future. All things that will have an effect on her ability to provide for and support her children.

There is no denying that a conviction record is viewed as conclusive evidence of bad character. In this regard, there can be little question that a conviction for a felony coupled with a sentence of imprisonment tends to "gravely besmirch" a person's reputation. As the Supreme Court noted, a felony is "as bad a word as you can give to a man, woman, or thing." *United States v. Morissette*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed.2d 288 (1952). Convicted felons cannot vote, sit on a jury, serve in public office, possess a firearm, obtain certain professional licenses, or obtain loan assistance and the ability to find housing is increasingly more difficult. The label of "convicted felon" combined with a proclamation that the defendant is so vile

that he or she must be separated from society, creates irreparable damage to the defendant's reputation and standing in the community. *Id*.

As Chief Justice Earl Warren wrote in *Parker v. Ellis*, 362 U.S. 574, 593-94, 80 S.Ct. 909, 920, 4 L.Ed.2d 963 (1960); "Conviction of a felony imposes a Status upon a person which not only makes him vulnerable to future sanctions through new civil disability statutes, but also seriously affects his or her reputation and economic opportunities." *See Carafas v. LaValee*, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). Private employers often avoid hiring applicants with criminal records, and there are even more formidable barriers where public employment or entry into licensed occupations is sought.

The collateral consequences of her conduct will continue to provide a significant punishment for the crime. As a result, the seriousness of the offense has been partially mitigated by the punishment the Defendant has already suffered and will suffer in the future in light of the social stigma of her convicted felon status. This Court can consider Ms. Walker's loss of profession and reputation as a factor when viewing what a just punishment is. *See United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting a downward departure where the defendant was punished by the loss of his business); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis 2005) (granting a variance in part because defendant lost a public sector job because of his conviction).

A sufficient, but not greater than necessary sentence, is designed to accomplish well defined objectives. District Court's are permitted to vary from the

recommended sentencing range when there exist mitigating circumstances of a kind not taken into consideration by the guidelines and may result in a sentence different from that prescribed by the guidelines. There is no question that the consequences of her actions will carry on well beyond whatever sentence is imposed. In this regard, Ms. Walker has accepted responsibility for her actions and begun the rehabilitative process. Undoubtedly, the Court may seek to punish the Defendant for her conduct in the instant offense, however, no sentence will take away the forever embarrassment she has caused her family and those closest to her and the forever stigma of being a felon in a theft related offense.

Ms. Walker recognizes that her actions have placed certain barriers in her future that will undoubtedly have a significant impact on her ability to support and provide for her children. Understanding this, Ms. Walker is still optimistic for her future and the future she has planned for her family.  She understands that an extreme work ethic and perseverance can overcome these barriers and help achieve the necessary success to provide for her family.

Lastly, given the current state of affairs, I would be remiss without discussing the plight of an incarcerated individual and harsh prison conditions during the current health crisis and Covid 19 Pandemic.

### 3. <u>**Severe Conditions of Confinement Due to the Pandemic**</u>.

It has been well-reported that as part of its response to the Covid 19 pandemic, the BOP has been deploying teams across the country to review conditions at agency facilities, including Florida facilities, to ensure they are

operating safely and appropriately during this uniquely challenging time. As the SARS-Cov-2 (Covid 19) spread across the United States in the spring 2020, the Federal Bureau of Prisons made the startling announcement that of its 2,700 initial screenings of inmates for the virus, 2,000 had tested positive – an astounding 70% positivity rate. *United States Bureau of Prisons' Response to the Covid-19 Pandemic,* *https://www.tandfonline.com/doi/full/10.1080/15564886.2020.1829765*. In early July 2020, a spike in the positivity rate to 26% in Florida's Miami Dade County was labeled as "staggering". The widespread outbreak in BOP facilities has created a number of unique areas concerns. From a public health perspective, infections among BOP inmates threaten to overwhelm the system's capacity to handle Covid 19 cases and presents significant challenges to those inmates with preexisting medical conditions.

This is the worst time in recent history to be incarcerated. Inmates are routinely locked down and quarantined. Their ability to have phone time and visitation with loved ones has been drastically decreased if permitted at all. Being incarcerated is never easy, but the current state of affairs are particularly harsh. *See United States v. Gonzalez, No. 18-cr-00669-JPO-SDNY, (Judge Paul Oetken found serving 24 months the equivalent of having served 3 years) ("I do believe that because it's been harsher than usual period that it's more punitive, that it's essentially the equivalent of either time and half or two times what ordinarily be served").*

The Pandemic has created a unique and potentially dangerous situation for incarcerated inmates. Those with preexisting health conditions such as diabetes

present more of a concern. The CDC notes that there is a higher prevalence of infection and chronic disease for inmates who are in poorer health than the general population, even at younger ages. This is likely due to the inherent design and operation of detention facilities. *Matos v. Lopez-Vega, 20-civ-60784, 2020 WL 2298775 (S.D.Fla. May 6, 2020)*.

The harsh conditions of confinement and the present dangers of incarceration caused by the pandemic is a factor to consider when deciding what is sufficient sentence. A request for a variance based on the harsh conditions of incarceration can be viewed similar to the arguments raised in recent compassionate release decisions. In this regard, there are many cases within the Southern District where courts have granted convicted felons compassionate release from prison based on diabetes and other medical conditions. *See United States v. Brown, 14-cr-60161, 2020 WL 5116781 (S.D.Fla. Aug. 31, 2020)* (J. Bloom) (compassionate release granted for defendant with Type II diabetes and high blood pressure*); United States v. Laing, 19 -cr-20731, 2020 WL 5032977 (S.D. Fla Aug. 24, 2020)* (J. Scola) (compassionate release granted for defendant with chronic medical conditions); *United States v. Wooley, 19-cr-80093, 2020 WL 4904210 (S.D.Fla. Aug. 20, 2020)* (J. Rosenberg) (compassionate release granted for defendant with Type II diabetes and obesity); *United States v. Siegert, 13-cr-8009, 2020 WL 4726929 (S.D.Fla. Aug. 13, 2020) (J. Altonaga)* (compassionate release granted for defendant with chronic health issues); *United States v. Weems, 18-cr-60185, 2020 WL 4558381 (S.D.Fla. Aug. 7, 2020)* (J. Bloom) (compassionate release granted for defendant with Type II

diabetes and other medical conditions); *United States v. Minsal, 18-cr-20797, 2020 WL 4516360 (S.D. Fla. Aug. 5, 2020)* (J. Altonaga) (compassionate release granted for defendant who is obese and asthmatic); *United States v. Feucht, 11-cr-60025, 2020 WL 2781600 (S.D.Fla. May 28, 2020)* (J. Middlebrooks) (compassionate release granted for defendant with Type II diabetes and other medical conditions); *United States v. Welch, 09-cr-60212, 2020 WL 4333667 (S.D. Fla. May 21, 2020)* (J. Mara) (compassionate release granted for defendant with Type II diabetes).

Due to the current state of affairs within the Bureau of Prisons, many inmates are serving time isolated from others and under solitary conditions that is not good for their mental health. *See McClary v. Kelly*, 4 F.Supp.2d 195, 207 (W.D.N.Y. 1998) (a conclusion that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this court as rocket science. Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they deteriorate mentally. *See also, The Eighth Amendment and Psychological Implications of Solitary Confinement, 21 Law and Psychology Review, Spring 1997, p. 271: "Solitary Confinement, Legal and Psychological Considerations," 15 New England Journal on Criminal and Civil Confinement, 301, Summer 1989).*

While the conditions of confinement created by the coronavirus pandemic are novel and unique to incarceration of individuals today, the request for consideration of the particularly harsh conditions of confinement at sentencing is not new. *See United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) (In effect *Schullo* is

arguing the harshness of the conditions and that the harder the conditions the shorter the sentence should be); *see also, United States v. Noriega*, 40 F.Supp.2d 1378 (S.D.Fla. 1999) (judges reduces sentence from 40 to 30 years, or a 25% percent reduction in sentence, in part because of the harsh nature of the confinement – There is little question that segregated confinement is a more difficult type of confinement than in general population. For some, the consequences of such deprivation can be serious.).

The harshness of confinement due to the current Covid 19 health crisis is a real and compelling reason for a variance from the recommended sentencing range. Especially, given the history and characteristics of Ms. Walker. Importantly, her strong family ties promote the strong likelihood of total rehabilitation and the unlikelihood for her to reoffend weigh in favor of a sentence below the advisory guideline range.

### 4.    Voluntary Surrender and Recommendation for South Florida Facility.

If, after consideration of all the arguments and relevant sentencing factors listed in 3553(a), the Court deems a guideline sentence is the appropriate sentence in this case, Ms. Walker respectfully requests that she be permitted to voluntarily surrender to the institution which she is designated. Ms. Walker is not a flight risk, nor a danger to the community. Moreover, she has complied with all the terms and conditions of her release and the request to voluntarily surrender will not affect the administration of justice.

A voluntary surrender will, however, have an impact on the scoring for designation purposes under the Security Designation and Custody Classification Manuel. *See P.S. 5100.07, Ch. 5., Table 5-6, Precommitment Status.* This is so because a defendant's Precommitment Status, his status preceding, during, and following trial, is an integral part of the designation scoring process, and points are awarded for voluntary surrender when an offender was not escorted by a law enforcement officer to either the U.S. Marshals Office or the place of confinement. This applies only to post-sentencing voluntary surrender and does not include cases where the offender surrendered to the U.S. Marshals Office on the same day as sentencing.

Lastly, because Ms. Walkers entire family including her children are located in South Florida, she respectfully requests that she be designated to a facility as close to South Florida as possible.

## CONCLUSION

For all these reasons, Ms. Walker moves this Honorable Court for a sentence this is sufficient but greater than necessary to achieve the purposes set forth in sentencing.

Respectfully submitted:
*s/; Peter T. Patanzo*
Benjamin, Aaronson, Edinger & Patanzo, PA
1700 East Las Olas Blvd, #202
Fort Lauderdale, Fl  33301
(954) 779-1700 phone
(954) 779-1771 fax
ppatanzo@benjaminaaronson.com
ppatanzo@bellsouth.net
Counsel for Ms. Walker

CERTIFICATE OF SERVICE

I HEREBY CERTITY that a true and correct copy of the foregoing has been electronically filed and uploaded to CM / ECF, this 7th day of July, 2021, and served on all those associated with the electronic service list including Assistant United States Attorney, David Snider, 99 NE 4th Street, Miami, Florida 33132, on this same day.

_s/; Peter T. Patanzo_
PETER T. PATANZO, ESQ.